**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELA LYNN KINNEY, | ) | CASE NO. 5:20-cv-01155 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| ANDREW SAUL, | ) | |
| *Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION**# |
| | ) | |
| Defendant. | ) | |

#

Plaintiff, Angela Lynn Kinney (Plaintiff), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (Commissioner), denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq*. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

### I. Procedural History

On April 27, 2017, Plaintiff filed her application for DIB, alleging a disability onset date (AOD) of April 10, 2017. (R. 12, Transcript (Tr.) 177-178). Plaintiff later amended her AOD to October 15, 2017. (Tr. 15, 238). Plaintiff's application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).

(Tr. 92-139). Plaintiff participated in the hearing on March 13, 2019, was represented by counsel, and testified. (Tr. 34-91). A vocational expert (VE) also participated and testified. *Id*. On May 7, 2019, the ALJ found Plaintiff not disabled. (Tr. 28). On March 26, 2020, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-6). On May 27, 2020, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 13. 15 & 16).

Plaintiff asserts the following assignments of error: the ALJ erred by (1) discrediting the medical opinions in the record and substituting her own unqualified opinion on medical matters beyond her expertise; (2) discrediting Plaintiff due to improper evaluation of her activities of daily living and medical treatment while using an incorrect standard of disability; (3) finding Plaintiff did not meet or medically equal Listing 14.09; and, (4) failing to meet the Step Five burden by failing to recognize a borderline age situation, opine an accurate RFC, and by relying on unclear VE testimony. (R. 13, PageID# 675-676).

## II. Evidence

### A. Relevant Medical Evidence[1]

#### 1.  Treatment Records

On July 14, 2016, Plaintiff's immunochemistry blood tests revealed a rheumatoid factor of 516, well outside the reference range of 0-14. (Tr. 383-384). On the same date, an x-ray of Plaintiff's left ankle revealed "no acute fracture, dislocation, bone erosion or periosteal reaction.

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes primarily only those portions of the record, which are cited by the parties in their briefs, that pertain to the period of alleged disability and are deemed directly relevant by the court to the assignments of error raised.

There is small plantar calcaneal spur." (Tr. 339).

On August 17, 2016, Plaintiff saw Kimberly A. Stewart, M.D., as a new patient for joint pain and swelling. (Tr. 410). Dr. Stewart noted there was "[h]igh suspicion of rheumatoid arthritis," and she discussed the side effects of Methotrexate with Plaintiff. *Id*. Smoking was noted as a risk factor and cessation was encouraged. *Id*. Rheumatologic evaluation was normal save for tenderness in the hands and feet. (Tr. 411-412). On the same date, x-rays of Plaintiff's hands revealed "[n]o significant radiographic abnormality." (Tr. 334-337).

Also on August 17, 2016, Plaintiff saw Jeffrey T. Junko, M.D., for complaints of left heel pain starting a year earlier. (Tr. 328). She had 5/5 muscle strength testing in all areas. (Tr. 330). Plaintiff was able to ambulate with a normal gait. *Id*. Dr. Junko observed moderate swelling at the posterior tibialis insertion site and mild flatfoot deformity, diagnosing left tibialis posterior tendonitis. *Id*. Dr. Junko prescribed a short leg walker boot and custom foot orthotic (Tr. 331).

On October 13, 2016, Plaintiff had a follow-up appointment with Dr. Stewart. (Tr. 405). It was noted Plaintiff had been started on Methotrexate at the prior office visit. *Id*. The assessment was rheumatoid arthritis involving multiple sites with positive rheumatoid factor. *Id*. Rheumatologic evaluation was normal. *Id*. On general examination, Plaintiff had no conjunctival erythema, no respiratory distress, no pedal edema, and no rash or skin lesions. (Tr. 405-406).

On February 8, 2017, Dr. Stewart's progress notes indicate Plaintiff was not taking Methotrexate or Prednisolone. (Tr. 402). Plaintiff had skipped an earlier follow-up visit. *Id*. Dr. Stewart observed Plaintiff had synovitis at multiple sites, and that her disease seems to have progressed since the last visit. *Id*. Plaintiff was "adamant that she does not want further treatment at this point …." (Tr. 402). Plaintiff reported reading about Methotrexate and not liking the side effects. *Id*. Rheumatologic evaluation revealed tenderness and swelling in the wrists bilaterally,

3

and in the right hand, as well as tenderness in both feet. (Tr. 403).

On May 17, 2017, Plaintiff saw Carlos Zevallos, Jr., D.O., for rheumatoid arthritis. (Tr. 394). She reported joint pain; stiffness; swelling particularly of the hands, knees, and ankles; increased fatigue; and, dry eyes and mouth. *Id*. He noted Plaintiff had refused to take Methotrexate after reading about possible side effects. *Id*. On examination, Plaintiff weighed 203 pounds, had synovitis of the hands and wrists, moderately decreased range of motion in the left wrist, decreased bilateral grip strength, warm and tender left ankle, tenderness in both feet, and left anterior cervical soft tissue fullness. (Tr. 395). Dr. Zevallos assessed rheumatoid arthritis of multiple sites without organ or systems involvement, arthralgia, myalgia, and fatigue. (Tr. 396). Plaintiff was prescribed Planequil and Prednisone. *Id*.

On June 26, 2017, Plaintiff saw Dr. Zevallos. (Tr. 436-439). On examination, Plaintiff's symptoms were largely unchanged from her previous visit. (Tr. 438). Dr. Zevallos explained that previously prescribed Planequil and other less immunosuppressive medications may not be sufficient for her disease process. (Tr. 438). Plaintiff indicated she was willing to try Methotrexate. *Id*. Dr. Zevallos continued to assess rheumatoid arthritis with rheumatoid factor of multiple sites without organ or systems involvement, arthralgia, myalgia, and fatigue. *Id*.

On November 10, 2017, Plaintiff again saw Dr. Zevallos, indicating that she had to restrict her work secondary to her arthritis. (Tr. 446). She reported not taking Methotrexate and continued to indicate that she was worried about possible side effects. *Id*. She reported increased pain in her hands and left ankle. *Id*. Treatment notes indicate Plaintiff reported "[o]verall feeling worse, but not taking recommended medications." *Id*. Dr. Zevallos's examination continued to show synovitis of the hands and wrists, moderate decreased range of motion of the left wrist, decreased grip strength bilaterally, and tenderness of the left ankle and feet. (Tr. 448). Treatment

4

notes state that Dr. Zevallos and Plaintiff "had another long discussion regarding her progressive disease, that she refuses to treat," which he warned "will cause her disability and likely organ involvement." *Id*. He also warned her of the danger that continued smoking will likely cause organ damage as well as the potential for cancer. *Id*. Dr. Zevallos continued to assess rheumatoid arthritis with rheumatoid factor of multiple sites without organ or systems involvement, arthralgia, myalgia, and fatigue. *Id*.

There are no records of treatment between December of 2017 and September 2018.

On September 14, 2018, Plaintiff saw Annabelle Morales-Mena, M.D., for a rheumatology initial consultation. It was noted that Plaintiff had been seen in the past by Dr. Zevallos. (Tr. 534). Plaintiff stated that she refused to follow directions of her prior rheumatologist and was medicating with marijuana seven days per week. *Id*. On examination, Plaintiff weighed 179 pounds, was in no acute distress, had normal mood and affect, normal sensation, and 5/5 strength in all extremities. (Tr. 536-537). She had tenderness to palpation in the upper thoracic lower cervical spine and shoulders as well as the greater trochanters, difficulty making a fist, bilateral swelling and deformity of the ankles, and subluxation of toes. (Tr. 537). She did not walk with an antalgic gait and did not require an assistive device. *Id*. Dr. Morales-Mena diagnosed seropositive rheumatoid arthritis of multiple joints. *Id*. Dr. Morales-Mena recommended trying disease-modifying antirheumatic drugs at a low dose and increased as tolerated. *Id*.

On October 12, 2018, Plaintiff saw Dr. Morales-Mena for a follow up, and she described worsening pain in all joints, swelling, and stiffness in the morning hours. (Tr. 527). She had tenderness to palpation in the upper thoracic lower cervical spine and shoulders, difficulty making a full fist, bilateral swelling and deformity of the ankles, and subluxation of toes. (Tr. 528). She had normal gait, muscle tone, and strength. *Id*. Dr. Morales-Mena recommended trying

5

hydroxychloroquine (HCQ). (Tr. 529).

On November 2, 2018, x-rays of the cervical spine and hands did not reveal any abnormalities (Tr. 517-525). On the same date, an x-ray of the right foot revealed mild lateral deviation of the 2nd through 4th toes, small erosions around the second metatarsal and proximal phalanx, no fracture, and mildly osteopenic bones. (Tr. 551). An x-ray of the left foot was largely unremarkable save for diffuse bone demineralization. (Tr. 552).

On November 9, 2018, Plaintiff underwent a carotid duplex study and echocardiogram due to stenosis and dizziness, the results of which were normal. (Tr. 586-590).

### 2. Medical Opinions Concerning Plaintiff's Functional Limitations

Prior to the AOD, on June 10, 2017, State Agency physician Angela Bucci, D.O., observed Plaintiff had severe inflammatory arthritis resulting in pain and weakness. (Tr. 95). Dr. Bucci noted that Plaintiff's reported symptoms were not substantiated by the medical evidence alone, but indicated they were fully consistent with the total medical and non-medical evidence. *Id*. Dr. Bucci found Plaintiff was limited to light exertional work, and retained the ability to sit and stand/walk for six-hours each in an eight-hour workday. (Tr. 96). In addition, Plaintiff could never climb ladders, ropes, and/or scaffolds. *Id*. With respect to manipulative limitations, Dr. Bucci found that Plaintiff was limited to frequent fingering bilaterally. (Tr. 97).

On September 10, 2017, approximately one month before the AOD, State Agency physician Leon Hughes, M.D., reviewed the record and assessed limitations echoing those assigned by Dr. Bucci. (Tr. 105-108).

On August 13, 2018, mental health nurse practitioner Tonya Gessler and social worker Julie Klein-Vavko completed a checklist-style mental RFC assessment. (Tr. 492-494). The form indicates that Plaintiff was unable to maintain attention and concentration for extended periods

6

of time, perform activities within a schedule, maintain regular attendance and/or be punctual, complete a normal workday/week, perform at a consistent pace, set realistic goals, or make plans independently. *Id*. They further indicated Plaintiff would have noticeable difficulty more than 20 percent of the workday/week in numerous other areas. *Id*. They checked a box indicating Plaintiff would miss more than four days per month, would be off-task over 20 percent of the day, and would require more than four unscheduled breaks per day. (Tr. 493). They noted that while Plaintiff tries to work fifteen hours a week, she calls off work often due to pain. (Tr. 494). They further observed as follows:

> Client has reported depression, anxiety, frustration related to these symptoms along with chronic pain, at times not able to use her hands because of the RA. Client reports mood swings, irritability, her panic attacks have increased, avoids situations because she "feels like a cripple." Has reported a low tolerance for stress.

(Tr. 494).

On January 25, 2019, Dr. Morales-Mena completed a questionnaire form created by Plaintiff's counsel. (Tr. 565-567). Dr. Morales-Mena opined Plaintiff could lift/carry 10 to 15 pounds occasionally and only two pounds frequently due to joint pain, swelling, and stiffness, which limit strength and mobility. (Tr. 566). She further opined Plaintiff could stand/walk for a total of zero to two hours per eight-hour workday in 20 to 30 minute increments, and sit for three to five hours in 30 minute increments due to inflammatory arthritis. *Id*. She opined Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl. *Id*. She further checked "yes" for all environmental limitations. *Id*. Finally, Dr. Morales-Mena indicated that Plaintiff would miss more than four days of work per month, would be off-task over 20 percent of the day due to pain and fatigue, would need to lie down during the workday for two hours or more, could only use her hands for ten percent of the workday, and would require more than four unscheduled breaks

per workday. (Tr. 567).

**B. Relevant Hearing Testimony**

At the March 3, 2019 hearing, Plaintiff testified as follows:

- She completed high school and attended some classes at a community college. (Tr. 41).

- She was working part-time for Dunkin' Donuts twelve to fifteen hours per week. (Tr. 42) She started as a baker but moved to a cashier-type position in April of 2017 after no longer being able to perform her former duties due to her health conditions. (Tr. 42-44). She was on her feet all day at the cashier position. (Tr. 47). She typically did not lift more than ten pounds as a cashier, but "sometimes" would lift ten to fifteen pounds. (Tr. 47-48). She held the title of shift leader, which involved mostly cashier work and some training of new employees. (Tr. 48-49).

- She also performed Door Dash food delivery part-time for the past eight to ten months. (Tr. 42. 49). She worked about three to six hours per week. (Tr. 50).

- She stated she is unable to work due to pain and stiffness in her joints stemming from arthritis. (Tr. 55). It takes her several hours to get moving in the mornings, and some mornings she does not get out of bed. *Id*. She does not have good days, and her pain is always around a six or a seven. (Tr. 57).

- She was bothered that she had to let her STNA (State Tested Nursing Assistant) certification lapse, as she worked hard to obtain it, and worked all of her life. (Tr. 56).

- Her physical ailments have caused her mental distress because she can no longer do the things she used to. (Tr. 57).

- She takes Naproxen, Plaquenil, Prednisone if she needs it, and Paxil. (Tr, 58-59).

- Two rheumatologists told her that Methotrexate is the gold standard for treating rheumatoid arthritis, but she declined to take it because she thought the side effects were worse than any help it would provide. (Tr. 60). She stated that the medication can make one sick all the time, cause hair loss, and renal failure. (Tr. 61).

- She has tried to change her diet to help with the strain on her joints and has lost 40 pounds. (Tr. 61).

- She has not tried medications that she and her rheumatologist called "biologics," as she was trying Plaquenil first. (Tr. 62).

- She still smokes, but reduced her smoking to half-a-pack per day. (Tr. 62).

- She smokes marijuana two to three times a week before bedtime, as it helps her when she feels really anxious. (Tr. 63). She denied using seven days a week, but conceded she might have the previous September. (Tr. 63-64).

- She watches her grandkids about three days a week for a few hours if her husband or son are there with her to help. (Tr. 65).

- She is able to care for her personal needs such as washing, dressing, and using the restroom, but sometimes she needs help with the restroom on a bad day. (Tr. 65-66).

- Her right and left hand are about the same in terms of pain and stiffness. (Tr. 66). She cannot make a complete fist with her fingers. *Id.*

- She washes dishes, but cannot carry a laundry basket or get on her knees to clean. (Tr. 67).

- She prepares meals, but does not lift heavy pots and cannot use a can opener. (Tr. 68).

- She will go grocery shopping if her husband goes with her. She uses the motorized riding cart. (Tr. 68).

- She rarely socializes, and will not go anywhere without her husband or son. (Tr. 69).

- If she is able to get up and shower and put in two to three hours of work at her job, she considers it a good day. (Tr. 70).

- She was having flare ups with her left eye until she started using eye drops recommended by her doctor, which has helped tremendously. (Tr. 72).

- She has two or three headaches per week. (Tr. 72).

- She was prescribed orthotics for her feet. (Tr. 72).

- As far as side effects, she reported that she does not really take Prednisone unless she has a flare, as it makes her feel like she has bugs running all over her head. Naproxen makes her sick to her stomach if she takes it on an empty stomach. She has not noticed any side effects with Plaquenil yet. (Tr. 73).

During the administrative hearing, the ALJ posed a series of hypothetical questions to the VE. (Tr. 75-90). In relevant part, the ALJ's fifth hypothetical incorporated all the limitations that ultimately comprised the RFC. The fifth hypothetical, which built upon the previously asked

hypotheticals, asked the VE to consider an individual with the following limitations:

> I would like you now please[] to assume a hypothetical individual of the claimant's age and education, and with those past jobs you have described. I would like you further to assume that this individual can perform light work as defined in the regulations with the following additional limitations. She can frequently finger with her bilateral upper extremities. She can never climb ladders, ropes or scaffolds.

> \*\*\*

> For the next hypothetical, I would like you to assume an individual with all of those same limitations from the first hypothetical, but with the following additional limitations. She can *frequently handle* or finger with her bilateral upper extremities. She can *occasionally operate foot controls with her bilateral lower extremities. She can frequently balance. Occasionally stoop, kneel or crouch; and never crawl. She must avoid concentrated exposure to extreme temperatures, humidity, and vibration. She must avoid all exposure to workplace hazards such as unprotected heights and moving mechanical parts*.

> \*\*\*

> For the next hypothetical, I would like you to assume an individual with all of those limitations from the most recent hypothetical, but with the additional limitation that this individual can *stand or walk for four hours* in an eight-hour workday.
> \*\*\*

> And add the following additional limitations [to hypothetical two]. This individual can perform *detailed but not complex tasks, meaning she can perform semiskilled work. She can interact frequently with coworkers and supervisors, but with no responsibility for collaboration, sales, arbitration, negotiation, confrontation, conflict resolution or the safety or welfare of others. She can adapt to occasional changes in the work setting or routine, so long as those changes are explained in advance and implemented gradually*…. I think that I may have intended to include in there that there would be no -- let me see here. That there would be *no interaction with the public* as part of the job duties. I apologize for leaving that out.

> \*\*\*

> So then if we took those *mental limitations and applied them instead to hypothetical 3*, which has the four-hour standing and walking limitations, would there be jobs that a person with those mental limitations could perform with those standing and walking limitations in addition?

10

(Tr. 75, 76, 77, 80, 81, 84) (italics added to highlight the additional limitations in each hypothetical). The VE testified that such an individual could perform the jobs of inspector hand packager, Dictionary of Occupational Titles (DOT) 559.687-074 (over 100,000 jobs nationally); assembler, plastic hospital products, DOT 712.687-010 (over 100,000 jobs nationally); and, assembler, electrical accessories, DOT 729.687-010 (over 200,000 jobs nationally). (Tr. 77, 83, 84). The following exchange clarified that the VE was accounting for the four-hour standing/walking limitation in addition to the other restrictions:

> Q:     Okay. So those two assembler jobs would also be available?
>
> A:     Those jobs would be jobs that such a hypothetical worker could perform.
>
> Q:     Okay. And the hand packager, those three jobs could be performed even with the standing and walking limitations?
>
> A:     Yes, because the jobs are performed sitting or standing. And that's based on my experience having done job analyses and labor market surveys. I think I already indicated that.

(Tr. 84).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

11

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023. (17D).

2. The claimant has not engaged in substantial gainful activity since April 10, 2017, the amended alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: Rheumatoid Arthritis,

Flatfoot Deformity of the Left Foot, Obesity, Anxiety Disorder, Major
Depressive Disorder and Cannabis Abuse Disorder. (20 CFR
404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments
that meets or medically equals the severity of one of the listed
impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that
the claimant has the residual functional capacity to perform light work as
defined in 20 C.F.R. § 404.1567(b) except the claimant can stand or walk
for four hours in an eight-hour workday. She can frequently handle or
finger with her bilateral upper extremities. She can occasionally operate
foot controls with her bilateral lower extremities. She can never climb
ladders, ropes, or scaffolds. She can frequently balance, occasionally
stoop, kneel, or crouch, and never crawl. She must avoid concentrated
exposure to extreme temperatures, humidity, and vibration. She must
avoid all exposure to workplace hazards such as unprotected heights and
moving mechanical parts. The claimant can perform detailed but not
complex tasks, meaning she can perform semiskilled work. She can
interact frequently with coworkers and supervisors, but with no
responsibility for collaboration, sales, arbitration, negotiation,
confrontation, conflict resolution, or the safety or welfare of others. She
can never interact with the public as part of her job duties. She can adapt
to occasional changes in the work setting or routine so long as those
changes are explained in advance and implemented gradually.

6.  The claimant is unable to perform any past relevant work (20 CFR
404.1565).

7.  The claimant was born on ***, 1969 and was 47 years old, which is
defined as a younger individual age 18-49, on the alleged disability onset
date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to
communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of
disability because using the Medical-Vocational Rules as a framework
supports a finding that the claimant is "not disabled," whether or not the
claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404,
Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual

13

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 10, 2017, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17, 18, 21, 26, 27, 28).

### V. Law and Analysis

**A. Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

14

### B.  Plaintiff's Assignments of Error

### 1. Consideration of Medical Opinions

In the first assignment of error, Plaintiff asserts the ALJ erred by discrediting every medical opinion in the record. (R. 13, PageID# 678-681). While the ALJ did not wholly adopt any single medical source opinion, Plaintiff's assertion that the ALJ discredited every opinion in the record is an overstatement.

First, the ALJ partially credited the opinions of the State Agency physicians. The ALJ found as follows:

> As part of the initial determination and the reconsideration, the State agency physicians opined that the claimant could engage in light work except that she could never climb ladders, ropes or scaffolds. The claimant could frequently finger. (1A; 3A). The undersigned finds this opinion somewhat persuasive. While the treatment record supports the limitations described, the progression of the claimant's symptoms was inconsistent with the limited degree of restrictions. The claimant's fingers and wrists exhibited synovitis, which affected her ability to handle objects. Her generalized pain limited her ability to tolerate extreme temperatures, vibrations and hazards. (7F; 9F; 10F). The claimant's swelling of the ankles and foot pain supported additional restrictions on standing and walking. (Testimony; 1F; 4F; 5F: 17F; 9F; 10F).

(Tr. 24). Despite Plaintiff contending that the ALJ discredited *all* medical opinions of record, Plaintiff acknowledged that the ALJ gave the State Agency opinions the most weight. (R. 13, PageID# 679). Moreover, the ALJ acknowledged that Plaintiff's impairments had progressed (or more accurately her symptoms worsened) since the State Agency physicians rendered their opinions, and the ALJ assessed a limitation to only frequent handling.[2] (Tr. 21, 24). Plaintiff appears to take issue with the ALJ not adopting the State Agency opinions, despite the fact that the ALJ assessed greater limitations. (R. 13, PageID# 679). Plaintiff also asserts the ALJ was

---

[2]  The State Agency physicians assessed limitations with respect to fingering (Tr. 97, 105-108), while the ALJ restricted Plaintiff to only frequent fingering *and* handling. (Tr. 21).

substituting her opinions for that of medical professionals or cherry-picking the evidence. *Id*. at PageID# 679-680.

Such arguments are unavailing and rarely successful. The Sixth Circuit has found that a claimant's allegation of cherry-picking evidence by an ALJ unavailing on appeal, agreeing with the court below that such an "allegation is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (*citing White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (finding "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.")); *accord Hammett v. Comm'r of Soc. Sec.*, No. 16-12304, 2017 WL 4003438, at *3 (E.D. Mich. Sept. 12, 2017); *Cromer v. Berryhill*, No. CV 16-180-DLB, 2017 WL 1706418, at *8 (E.D. Ky. May 2, 2017); *Anderson v. Berryhill*, No. 1:16CV01086, 2017 WL 1326437, at *13 (N.D. Ohio Mar. 2, 2017), *report and recommendation adopted*, 2017 WL 1304485 (N.D. Ohio Apr. 3, 2017). To the contrary, it is the responsibility of the ALJ to resolve the conflicts in the record where there are conflicting opinions resulting from essentially the same medical data. *See, e.g., Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 373 (6th Cir. 2006) ("The ALJ had the duty to resolve conflicts in medical evidence"); *Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990); *see generally Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004) (ALJ's responsibility to evaluate medical evidence and claimant's testimony to assess RFC). "It is the duty of the ALJ, as the trier of fact, to resolve conflicts in the medical evidence." *Hensley v. Astrue*, No. 12-106, 2014 WL 1093201 at *4 (E.D. Ky. Mar. 14, 2014) *citing Richardson v. Perales*, 402 U.S. 389, 399 (1971)). "It is the ALJ's place, and not the reviewing court's, to resolve conflicts in evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 670 (6th Cir. 2009) (citations omitted).

Furthermore, State Agency consultative opinions may constitute substantial evidence supporting an ALJ's decision. *See, e.g., Lemke v. Comm'r of Soc. Sec.*, 380 Fed. App'x. 599, 601 (9th Cir. 2010) (finding that the ALJ's decision was supported by substantial evidence where it was consistent with the opinion of the State Agency's evaluating psychological consultant, which was consistent with the other medical evidence in the record); *Filus v. Astrue*, 694 F.3d 863 (7th Cir. 2012) (finding that State Agency physicians' opinions that a claimant did not meet or medically equal any listed impairment constituted substantial evidence supporting the ALJ's conclusion); *Cantrell v. Astrue*, 2012 WL 6725877, at *7 (E.D. Tenn. Nov. 5, 2012) (finding that the State Agency physicians' reports provided substantial evidence to support the ALJ's RFC finding); *Brock v. Astrue*, 2009 WL 1067313, at *6 (E.D. Ky. Apr. 17, 2009) ("[T]he argument that the findings of the two non-examining state agency physicians cannot constitute substantial evidence is inconsistent with the regulatory framework."); *Clark v. Astrue*, 2011 WL 4000872 (N.D. Tex. Sept. 8, 2011) (State Agency expert medical opinions "constitute substantial evidence to support the finding that plaintiff can perform a limited range of light work.") Although Plaintiff contends that a more restrictive RFC could have been assessed based on the medical record, that belief does not establish a violation of the substantial evidence standard.

Plaintiff asserts that the opinions of the State Agency physicians predate the amended AOD, and, therefore, are essentially useless. (R. 13, PageID# 680). Defendant contends that it is not error for an ALJ to consider the findings of state agency consultants, even if they do not see all the evidence where "[i]t is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after [the state agency physician's] assessment . . . and took into account any relevant changes in [claimant's] condition." (R. 15, PageID# 700, quoting *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009)). Here, the ALJ plainly

17

considered the subsequent treatment rendered by no less than three separate rheumatologists (Tr. 22-24), and assessed limitations greater than those offered by the State Agency physicians precisely because the medical records demonstrated deterioration.

Plaintiff's generalized complaint that the State Agency physicians did not have access to some of the more recent medical evidence does not provide a basis for remand. *See, e.g., Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (claimant "misconstrues the Court's holding in *Blakley v. Commissioner of Social Security* as providing a blanket prohibition on an ALJ's adoption of a non-examining source opinion, where that source has not reviewed the entire record"); *Downs v. Comm'r of Soc. Sec.*, 634 F. App'x 551, 554 (6th Cir. 2016) (finding no error where the ALJ accorded greater weight to the opinions of State agency physicians than to a treating source where the ALJ provided "sound reasons" supported by substantial evidence); *Williamson v. Comm'r of Soc. Sec.*, No. 1:11cv828, 2013 WL 121813 at *6 (S.D. Ohio Jan. 9, 2013) ("There is no regulation or case law that requires the ALJ to reject an opinion simply because medical evidence is produced after the opinion is formed. Indeed, the regulations provide only that an ALJ should give more weight to an opinion that is consistent with the record as a whole."), *report and recommendation adopted*, 2013 WL 1090303 (S.D. Ohio Mar. 15, 2013). Therefore, the court finds no error with respect to the ALJ's handling of the State Agency physicians' opinions.

Plaintiff next takes issue with the ALJ's rejection of the opinion of a treating physician, Dr. Morales-Mena, in a checklist-style questionnaire, and argues the ALJ was "playing doctor" by interpreting the record and coming to her own conclusions. (R. 13, PageID# 678-679). The court notes that Plaintiff's claim was filed after March 27, 2017. Therefore, the ALJ's consideration of the medical opinions of record are governed by 20 C.F.R. § 404.1520c. The

amendments to the regulations are considered to have abolished the treating physician rule. *See, e.g., Bovenzi v. Saul*, No. 1:20CV0185, 2021 U.S. Dist. LEXIS 61932, at *7-8 (N.D. Ohio Mar. 31, 2021) ("Under the new regulations applicable to claims filed on or after March 27, 2017, the opinions of [a treating medical source] are not entitled to any specific evidentiary weight.") (Pearson, J.).

Pursuant to 20 C.F.R. § 404.1520c(a), an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." The ALJ addressed Dr. Morales-Mena's opinion as follows:

> The undersigned finds this opinion to be unpersuasive. Dr. Morales-Mena supported her conclusions by citing to the claimant's rheumatoid arthritis. However, the opinion was inconsistent with the objective findings in the medical record as a whole. The claimant's arms and legs had full range of motion and she walked with a normal gait. (1F; 3F; 7F; 14F; 18F). The record further reflects that the claimant repeatedly refused to follow medical advice regarding her treatment and continued to smoke despite the exacerbating effects of that activity. It further demonstrates that the claimant continued to work a part time job that required her to be on her feet and manipulate with her upper extremities despite her symptoms. These facts are inconsistent with the degree of limitations described. Finally, at the time of her opinion, Dr. Morales-Mena was a new treating physician who had begun treating claimant only months before, which reduces the analytical value of her opinion. (Testimony; 11D; 16D; 19D).

(Tr. 24).

Plaintiff has not identified any error relating to the ALJ's consideration of Dr. Morales-Mena's opinion under the regulations. She contends the ALJ improperly discredited Dr. Morales-Mena's opinion, in part, because the doctor only recently began treating Plaintiff. However, under 20 C.F.R. § 404.1520c(c)(3)(i) & (ii), the length of the treatment relationship as well as the frequency of examinations are proper factors for an ALJ to consider. In addition, the regulations state that supportability and consistency "are the most important factors we consider when we

19

determine how persuasive we find a medical source's medical opinion." 20 C.F.R. § 404.1520c(b)(1). The ALJ clearly found that the opinion was inconsistent with the objective findings in the medical record as a whole, and gave examples of the inconsistency. Conclusory allegations that the ALJ was playing doctor are simply insufficient to demonstrate error.

Plaintiff also takes issue with the ALJ's finding that the opinions MHNP Gessler and social worker Klein-Vavko were "unpersuasive." (R. 13, PageID# 679). The ALJ addressed their opinion as follows:

> In a medical opinion dated August 2018, Julie Klien Venho, LISW-S and a certified nurse practitioner opined that the claimant would have noticeable difficulty ten percent of the time when remembering short simple and detailed instructions, making simple work related decisions, and asking simple questions. She would have noticeable difficulty eleven to twenty percent of the time remembering work-like procedures and remaining aware of normal hazards. She would have noticeable difficulty more than twenty percent of the time maintaining an ordinary routine, working in coordination or in the proximity of others, interacting with the public, accepting instructs or criticism from supervisors, and getting along with coworkers. The claimant was not able to sustain attention or concentration for extended periods or be punctual. She opined further that the claimant would be absent more than four days a month and would be off task over twenty percent of a workday. Finally, she opined that the claimant would require more than four unscheduled breaks. (12F).

> The undersigned finds this opinion to be unpersuasive. The mental health record lacked support for and was not consistent with the described degree of limitations. Despite reportedly calling off work regularly, the claimant worked at nearly substantial gainful activity levels at Dunkin Donuts. She also worked part time as a Door Dash delivery driver. In addition to the claimant's work activity, she regularly helped care for her grandchildren, including taking her grandchildren out of the house to locations such as the park. She was able to attend social events with friends and go to concerts at Blossom. In addition, the claimant was able to complete household chores such as doing laundry and washing dishes. (Testimony).

(Tr. 25-26).

Here, Plaintiff contends the ALJ's above analysis has failed to provide sufficient justification for rejecting a treating source opinion. (R. 13, PageID# 679). However, the ALJ is

no longer obligated to give good reasons for rejecting the opinion of a treating medical source.

Furthermore, under the rules applicable to claims filed before March 27, 2017, neither nurse

practitioners nor social workers were considered acceptable medical sources and, therefore, not

subject to the treating physician rule.[3]  Under the current regulations, Plaintiff asserts the ALJ

failed to point to specific references to the record to support the finding that Gessler's and Klein-

Vavko's opinion "lacked support for and was not consistent with the described degree of

limitations." (R. 16, PageID# 710). While Plaintiff is correct that the ALJ did not specifically

identify which portions of the medical record were inconsistent with or unsupported by the

medical record in the same paragraph that the ALJ discussed their opinion, the court disagrees

that subsequent reviewers, such as this court, are left guessing. Reading the decision as a whole,

the ALJ discussed Plaintiff's mental health impairments in the six paragraphs leading up to the

discussion of Gessler and Klein-Vavko's opinion. (Tr. 24-25). Medical records repeatedly

showed that Plaintiff's thought content was logical, she had fair or good insight and judgment,

intact memory and concentration, and clear speech. *Id*. The ALJ observed that Plaintiff's

medication regimen remained stable, suggesting that the claimant's symptoms were managed

---

[3] A nurse practitioner was not an "acceptable medical source," but was rather considered an "other source." *McNamara v. Commissioner*, 623 Fed. Appx. 308, 2015 WL 8479642, at *1 (6th Cir. 2015) (*per curiam*) (citing 20 C.F.R. § 416.913(d)(1)); SSR 06-3p, 2006 SSR LEXIS 5, 2006 WL 2329939, at *2; *see also Noto v. Commissioner*, 632 Fed. Appx. 243, 2015 WL 7253050 at *4 (6th Cir. 2015) (because nurse practitioners are not considered an "acceptable medical source" under the pertinent regulations, they cannot provide a "medical opinion," and the ALJ's decision need not afford any special deference to statements from a nurse practitioner). *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016) (observing that a "licensed clinical social worker" is not an "acceptable medical source," and, therefore, rejecting the contention that a social worker's opinion was owed deferential weight); *accord Racz v. Comm'r of Soc. Sec.*, No. 3:15-cv-74, 2016 WL 612536 at *10 (S.D. Ohio Feb. 16, 2016) (finding it was erroneous to categorize a social worker as a "treating source," as "licensed independent social workers are not 'acceptable medical sources'").

adequately. (Tr. 25). Moreover, if an ALJ finds that an opinion lacks support in the medical record, then the ALJ cannot cite to portions of the record that do not exist. If a Plaintiff takes issue with such a conclusion, the best attack would be to refute the ALJ's finding by specifically citing those portions of the record that do indeed support the specific limitations assessed by a source. Here, while Plaintiff has cited mental health treatment records generally, she has not pointed to any evidence of record that specifically supports the significant limitations assessed by Gessler and Klein-Vavko.

Furthermore, it bears noting that the ALJ did assess mental-health related limitations in the RFC (Tr. 21). However, the ALJ reasonably construed some limitations assessed by Gessler and Klein-Vavko—such as a limited ability to work in coordination with others or to get along with coworkers—as contradicted by Plaintiff's continued ability to work at Dunkin' Donuts part-time. This is not a case where an ALJ mistakenly equated the ability to work part-time to an ability to engage in full-time work. Instead, the ALJ merely concluded that some of the limitations in the disputed opinion were undermined by Plaintiff's actual activities while engaging in work, even if that work did not arise to substantial gainful activity under the regulations that would preclude a disability finding.

Finally, Plaintiff's generalized claim that the ALJ failed to analyze the medical opinions thoroughly (R. 13, PageID# 682) is again conclusory and fails to demonstrate error.

### 2. Credibility Assessment

In the second assignment of error, Plaintiff asserts the ALJ erred by discrediting her testimony regarding the level of impairment caused by her symptoms. (R. 13, PageID# 681-684). "[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y*

22

*of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). An ALJ is not required to accept a claimant's subjective complaints. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *accord Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173 (6th Cir. 2016). The *Villarreal* court noted "tolerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant," and an ALJ's credibility finding "should not lightly be discarded." *Villarreal*, 818 F.2d at 463 (citations omitted). Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite *some* other evidence for denying a claim for pain in addition to personal observation").

"In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304 at *10 (Oct. 25, 2017). Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *10. A reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason," *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and "in practice ALJ credibility findings have become essentially 'unchallengeable.'" *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (*citing Payne v.*

*Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6ᵗʰ Cir. 2010)).

According to SSR 16-3p, evaluating an individual's alleged symptoms entails a two-step process that involves first deciding whether a claimant has an "underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."[4] 2017 WL 5180304 at *2-3. The ALJ's decision found the first step was satisfied and states that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms…." (Tr. 22).

After step one is satisfied, an ALJ should consider the intensity, persistence, and limiting effects of an individual's symptoms. The ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 22). The ALJ's decision unfortunately does not contain a single, unified discussion of the credibility of Plaintiff's alleged symptoms and their limiting effects, but the ALJ did conclude the intensity, persistence, and limiting effects of her symptoms were "inconsistent with the record for the reasons specified above." (Tr. 26). Nevertheless, the court considers the ALJ's decision as a whole.

---

[4] "The Sixth Circuit characterized SSR 16-3p … as merely eliminating 'the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Butler v. Comm'r of Soc. Sec.*, No. 5:16cv2998, 2018 WL 1377856, at *12 (N.D. Ohio, Mar. 19, 2018) (Knepp, M.J.) (*quoting Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6ᵗʰ Cir. 2016)). Like several other courts, this court finds little substantive change between the two social security rulings, and the changes largely reflect a preference for a different terminology. *See, e.g., Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666, at *7 (N.D. Tex. Feb. 10, 2017) ("having reviewed the old and new rulings, it is evident that the change brought about by SSR 16-3p was mostly semantic."). While the court applies the current SSR, it declines to engage in verbal gymnastics to avoid the term credibility where usage of that term is most logical.

When considering the intensity, persistence, and limiting effects of an individual's symptoms, an ALJ should consider the following seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p at *4-8 (same factors as in SSR 96-7p). The ALJ discussed several of the seven factors set forth in SSR 16-3p for finding Plaintiff less than fully credible. These included Plaintiff's daily activities as well as her course of treatment.

Specifically with respect to treatment for rheumatoid arthritis, the ALJ noted as follows:

The claimant's actions regarding her treatment also indicated that her symptoms were not as severe as alleged. Two rheumatologists advised the claimant that Methotrexate was the best course of treatment to manage her rheumatoid arthritis. She refused to follow medical advice regarding the use of Methotrexate to mitigate her symptoms and the condition's associated physiological changes. Even after a more conservative means of treatment was allegedly ineffective, she did not elect to use Methotrexate. Furthermore, the claimant continued to smoke despite being advised that smoking exacerbated her rheumatoid arthritis. (Testimony).

(Tr. 24). Plaintiff misconstrues the ALJ's finding as an improper medical judgment that Methotrexate would have improved her symptoms, and argues that the ALJ is not qualified to make such a conclusion. (R. 13, PageID# 684). The ALJ, however, was merely making an inherently reasonable determination that a patient with the severity of the symptoms alleged would likely follow recommended treatment, a medication Plaintiff herself referred to as the gold

25

standard for treatment of rheumatoid arthritis. (Tr. 60). With respect to mental impairments, the ALJ also discussed Plaintiff's medications and observed that the lack of changes in her medication regimen suggested her symptoms were adequately managed. (Tr. 25). The ALJ also pointed to a nine-month gap in medical treatment, which the ALJ also construed as suggesting that Plaintiff's symptoms "were not as severe as alleged." (Tr. 23).

With respect to daily activities, the ALJ pointed out that Plaintiff's part-time work required her to be on her feet and to manipulate with her upper extremities. (Tr. 24). Again, it was not unreasonable for the ALJ to conclude that Plaintiff's alleged limitations were inconsistent with her ability to perform her part-time work, decreasing the reliability of her subjective complaints. Though a more detailed analysis is always preferred, an ALJ is not required to analyze all seven factors, but should consider the relevant evidence. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (Baughman, M.J.) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence"); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005) (finding that neither SSR 96-7p nor the regulations "require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination"); *Wolfe v. Colvin*, No. 4:15-CV-01819, 2016 WL 2736179, at *10 (N.D. Ohio May 11, 2016) (Vecchiarelli, M.J.); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *9 (N.D. Ohio Apr. 4, 2012) (White, M.J.). SSR 16-3p itself states that where "there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor," but rather will only "discuss the factors pertinent to the evidence of record." *Id*. at *8.

To the extent Plaintiff asserts that her alleged degree of limitation is supported by her own testimony or her documented complaints, such assertions amount to circular reasoning.

26

Furthermore, there is ample case law rejecting such questionable logic. Plaintiff's statements made to medical sources or to an occupational therapist are not *per se* credible, nor are they transformed into "medical opinions" simply because the patient's statements have been recorded in treatment notes. *See, e.g., Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. 2011) (concluding the physician's statement "is not a 'medical opinion' at all—it merely regurgitates [the patient's] self-described symptoms"); *accord Paddock v. Comm'r of Soc. Sec.*, No. 1:11-cv-7, 2012 U.S. Dist. LEXIS 135860, 2012 WL 4356711 (W.D. Mich. Sept. 24, 2012); *see also Boughner v. Comm'r of Soc. Sec.*, No. 4:16-CV-1858, 2017 U.S. Dist. LEXIS 89060, 2017 WL 2539839, at *8 (N.D. Ohio May 22, 2017), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 89061, 2017 WL 2501073 (N.D. Ohio June 9, 2017) (finding that medical records containing observations recorded by a claimant's physician were likely statements made by plaintiff about his condition and not medical opinions as defined by the regulations); *Coleman v. Comm'r of Soc. Sec. Admin.*, No. 1:16-CV-0179, 2016 U.S. Dist. LEXIS 184079, 2016 WL 8257677, at *14 (N.D. Ohio Nov. 29, 2016), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 21835, 2017 WL 633423 (N.D. Ohio Feb. 15, 2017) (finding that "office notes reflect plaintiff's own subjective statements regarding her condition" and, therefore, do not constitute "objective medical evidence"); *Rogers v. Astrue*, No. 11-cv-82, 2012 U.S. Dist. LEXIS 24712, 2012 WL 639473, at *4 (E.D. Ky. Feb. 27, 2012) ("Simply recording Plaintiff's subjective complaints is not objective medical data therefore Dr. Lyons' clinical findings were insufficient to support a deferential review by the ALJ.")

An ALJ's credibility determination is not rendered erroneous simply by the identification of some evidence of record that may support allegations of greater limitations, nor is it undermined by a claimant offering a different interpretation of the evidence of record. The latter is

tantamount to an invitation for this court to reweigh the evidence and to engage in its own credibility analysis. However, this court's role in considering a social security appeal does not include reviewing the evidence *de novo*, reweighing the evidence, or making credibility determinations. *Brainard*, 889 F.2d at 681.

Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, the court does not find the ALJ's credibility analysis was deficient. Thus, Plaintiff's second assignment of error is without merit.

### 3. **Listing 14.09**

Plaintiff asserts that the ALJ erred when considering Listing 14.09, and claims that the record demonstrates she met the requirements of 14.09(A)(2), (B)(1) & (2), and (D). (R. 13, PageID# 684). She characterizes the ALJ's analysis as cursory and unsupported. At the third step in the sequential evaluation, the burden of proof for establishing that an impairment meets or equals the requirements of a listing rests with the claimant. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). To meet a listed impairment, a claimant must satisfy *all* of the criteria in the listing. *See Roby v. Comm'r of Soc. Sec.*, 48 Fed. App'x 532, 536 (6th Cir. 2002) (citing *Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987)). There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006); *accord Osborne v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 113937, 2014 WL 4064078 (N.D. Ohio Aug. 15, 2014) (Knepp, M.J.); *Snoke v. Astrue*, 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6 (S.D. Ohio 2012).

Furthermore, an ALJ's failure to directly list the elements of a listing and then discuss the evidence of record showing that a claimant does or does not meet that listing can be harmless

error if the ALJ's ultimate Step Three finding is supported by factual findings made elsewhere in the record. *Campbell v. Comm'r of Soc. Sec.*, No. 1:13 CV 329, 2013 U.S. Dist. LEXIS 182402, at *14 n.59 (N.D. Ohio Dec. 17, 2013) (*citing White v. Colvin*, No. 4:12-cv-11600, 2013 U.S. Dist. LEXIS 131775, at *21-22 (E.D. Mich. Sep. 16, 2013) (collecting cases, noting "[n]umerous courts have read *Bledsoe[v. Barnhart*, 165 Fed. App'x 408 (6th Cir. 2006),] as "implicitly endors[ing] the practice of searching the ALJ's entire decision for statements supporting his [S]tep [T]hree analysis.")).

The disputed listing herein is Listing 14.09, inflammatory arthritis (as described in 14.00D6), which contains the following requirements:

> A. Persistent inflammation or persistent deformity of:
>
> > \*\*\*
>
> > 2.    One or more major joints in each upper extremity (see 14.00C8) and medical documentation of an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 14.00C7); *or*
>
> B. Inflammation or deformity in one or more major joints of an upper or a lower extremity (see 14.00C8) with:
>
> > 1.    Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; *and*
>
> > 2.    At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
>
> *or*
>
> > \*\*\*
>
> D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

        1. Limitation of activities of daily living.

        2. Limitation in maintaining social functioning.

        3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added).[5]

Plaintiff contends the ALJ failed to discuss Listing 14.09(A)(2), and made only a cursory conclusion that is not supported by the record. According to Plaintiff, "treatment notes show her RA affects one or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively." (R. 13, PageID# 684). Moreover, Plaintiff asserts the records show "significant problems with her upper extremities, including subluxation, synovitis, decreased grip strength, decreased range of motion, stiffness, and swelling." *Id*. The (A)(2) criteria, however, "requires medical documentation of an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements." The ALJ plainly found that Plaintiff's ability to maintain her own hygiene, as well as her ability to work as a cashier and shift leader undermined Plaintiff's contention that she could not independently initiate, sustain, and complete work-related activities involving fine and gross movements. (Tr. 19). Plaintiff, without explanation, points to over forty pages of the record in a string citation. (R. 13, PageID# 684). Some of the citations are not medical records, and others merely contain her subjective complaints. Moreover, it is not this court's function to hunt down the required medical documentation the listing demands. If it is a party's position that there is such medical

---

[5]  The court omits some of the listing criteria, as Plaintiff has only argued that she met the criteria of (A)(2), (B), and/or (D). (R. 13, PageID# 684).

documentation, it is incumbent upon that party to identify those records with greater specificity *and* to explain how those records satisfy the listing. As explained above, at the third step in the sequential evaluation, Plaintiff bears the burden of proof for establishing that she meets or equals the requirements of a listing.

Turning to 14.09(B), the criteria is written in the conjunctive requiring both (B)(1) and (B)(2) to be satisfied. The (B)(1) criteria requires the involvement of "two or more *organs/body systems* with one of the organs/body systems involved to at least a moderate level of severity." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added). The ALJ expressly found "[t]he record contained no evidence of the involvement of two or more organ/body systems." (Tr. 19). Dr. Zevallos's treatment notes from 2017 routinely diagnosed Plaintiff with rheumatoid arthritis, but specifically stated "without organ or systems involvement," at each visit. (Tr. 396, 438, 448). Despite a multitude of string citations in her brief, Plaintiff does not affirmatively identify a single treatment record stating that her rheumatoid arthritis involved organs or systems as required by the listing. (R. 13, PageID# 685).

Plaintiff also contends she satisfied the requirements of Listing 14.09(D) due to "repeated manifestations of inflammatory arthritis with severe fatigue and malaise … with marked limitation in activities of daily living." (R. 13, PageID# 685). She further asserts that the record demonstrates that she struggled with "social functioning … and completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." *Id*. The ALJ found that "[t]he claimant reported that she was able to maintain her own hygiene and was able to cook. She worked as a cashier and shift leader at earnings levels just below substantial gainful activity throughout the alleged period of disability. (Testimony; 9D; I ID; 16D; 7F; 9F). Therefore, the claimant's impairments did not meet or equal Listings 14.09(A) or 14.09(D)." (Tr. 19).

Plaintiff's unexplained string citations to the record do not render the ALJ's decision deficient. First, it is not enough for Plaintiff to point to portions of the record which she believes supports her conclusion. It is not appropriate for the court to take an undeveloped or conclusory argument and then scour the record to develop an argument for a party or to bolster party's skeletal arguments.[6] Second, it is insufficient for Plaintiff to point to records that, if construed differently, could result in a different determination. As stated above, a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512. The court cannot find the ALJ's determination, that Plaintiff's activities did not result in marked limitations sufficient to meet the listing, was unsupported.

The court recommends finding that Plaintiff's third assignment of error is without merit, as the ALJ clearly considered the potential applicability of Listing 14.09, and Plaintiff has not identified any error in the ALJ's analysis. Although the decision could have been more specific with regard to this listing, there is no heightened articulation standard that an ALJ must satisfy when considering a listing.

### 4. Step Five Burden

In her fourth assignment of error, Plaintiff asserts that "the ALJ failed to meet her Step Five burden." However, Plaintiff primarily argues instead that the ALJ's decision was untenable

---

[6] *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *accord Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 2006 U.S. App. LEXIS 11680 (6th Cir. May 11, 2006). "This Court does not conduct a *de novo* review in social security proceedings, and certainly cannot be expected to craft an argument on Plaintiff's behalf." *Collins v. Comm'r of Soc. Sec.*, No. 1:18-cv-02271, 2019 U.S. Dist. LEXIS 93283, at *4 (N.D. Ohio Apr. 16, 2019) (citations omitted).

because a subsequent disability application filed by Plaintiff resulted in a grant of benefits as of September 17, 2019. (R. 13, PageID# 685-686). Plaintiff asserts that: "The fact that SSA determined Kinney was disabled and had a more limited RFC just four months after the ALJ's Decision indicates that her RFC determination was erroneous." *Id*. Plaintiff, however, cites no authority suggesting that a different outcome in a subsequent application renders a prior decision erroneous and subject to remand. A different outcome could be supported by any number of reasons, including a worsening in Plaintiff's symptoms or the presence of more up-to-date medical opinions.

Plaintiff also asserts that on the day of the ALJ's Decision, May 2, 2019, she was only four months away from her 50th birthday. Plaintiff then asserts in a completely conclusory manner that the "the ALJ should have found that Kinney was limited to sedentary work." (R. 13, PageID# 685). As this court understands Plaintiff's contention, POMS[7] DI 25015.006 states that a borderline age situation exists "[i]f a claimant is within a few days or months of reaching a higher category and using the chronological age results in a denial." Under such circumstances, POMS advises that an ALJ can "consider using the higher age category if it results in a favorable determination…." Plaintiff, however, appears to assume that the sedentary level of exertion is applicable despite the ALJ explicitly finding that Plaintiff could perform light exertional work with additional limitations. The mere assertion that the sedentary level of exertion should apply fails to furnish a basis for a remand. Further, Plaintiff has not argued that the borderline age

---

[7] The Program Operations Manual System (POMS) is the operational reference used by Social Security Administration staff to conduct daily business. "While these administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect ..." *Washington Dep't of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). The POMS is available at http://www.ssa.gov/regulations/index.htm.

scenario is an issue if the exertional level is light as determined by the ALJ.

Finally, Plaintiff further asserts "[t]he ALJ relied on muddled and unclear vocational testimony to support her Step Five findings," claiming that the VE "repeatedly got confused during his testimony and was not confident in the accuracy of his answers." (R. 13, PageID# 686, *citing* Tr. 79-84, 89-90). At the fifth and final step of the disability analysis, if a claimant cannot perform his or her past relevant work, it must be determined whether the claimant can make an adjustment to other work in light of the claimant's RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The burden shifts to the Commissioner, at this final step, to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999); *accord White v. Comm'r of Soc. Sec.*, 312 Fed. App'x 779 (6th Cir. 2009). An ALJ's finding in this regard must be supported by substantial evidence (*i.e.* that the claimant has the vocational qualifications to perform specific jobs). *Workman v. Comm'r of Soc. Sec.*, 105 Fed. App'x 794, 799 (6th Cir. 2004) (*citing Varley v. Sec'y of Health & Varley*, 820 F.2d 777, 779 (6th Cir. 1987)).

Plaintiff's brief, however, neglects to set forth the VE's relevant testimony in any detail. In the court's recitation of the relevant hearing testimony, set forth above, it is clear that the VE posed a hypothetical question that accounted for all of the limitations that are contained in the RFC. (Tr. 75, 76, 77, 80, 81, 84). It is true that the hypothetical was cumulative in nature, but the VE appears to have understood it. The VE then proceeded to unambiguously identify a number of jobs that the hypothetical individual could perform. (Tr. 77, 83, 84). Plaintiff, without actually addressing the contents of the testimony directly, asserts the VE repeatedly got confused. (R. 13, PageID# 686, citing Tr. 79-84, 89-90). At one point the VE did indicate he was a little confused

about the hypothetical being asked. (Tr. 81). The ALJ proceeded to take a "step back" and the

following exchange occurred:

> [VE]:  No problem. Okay. Then that hypothetical worker -- I am a little confused
> now, Your Honor.
>
> [ALJ]: I am sorry. So let's step back. Let me read the —
>
> [VE]:  I'm sorry. I'm sorry too.
>
> [ALJ]: That's all right. That' s all right. So we're going to go back to hypothetical
> 2 which is before the —
>
> [VE]:  Okay.
>
> [ALJ]: Before the four-hour stand/walk.
>
> [VE]:  Okay. So four hours stand/walk?
>
> [ALJ]: Before.
>
> [VE]:  Before that. Right.
>
> [ALJ]: Right. Hypo 2.
>
> [VE]:  Exactly. I'm following you now. Okay. Because I had written some of the
> stuff down.

(Tr. 81). There is no indication that the VE's momentary confusion was not resolved by the

above exchange. Another portion of the VE's testimony, where Plaintiff's counsel asserted that

the VE misunderstood the question, is irrelevant. (Tr. 89-90). Not only did counsel and the VE

resolve the misunderstanding before the VE testified, but the limitation being discussed—a

limitation to only using the upper extremities for ten percent of the workday—is a limitation that

was not adopted by the ALJ. Thus, the VE's testimony that there would be no jobs for such an

individual is irrelevant.

Plaintiff's final assignment of error is without merit.

35

## VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.

> *s/ David A. Ruiz*
> David A. Ruiz
> United States Magistrate Judge

Date: July 12, 2021

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.** *See Berkshire v. Beauvais,* **928 F. 3d 520, 530-31 (6th Cir. 2019).**